**Angelica Marie HARPER, Plaintiff,**

v.

**SOUTHEAST ALABAMA MEDICAL CENTER, et al., Defendants.**

**Civil Action No. 93–C–1521–S.**

United States District Court,
M.D. Alabama,
Southern Division.

Feb. 11, 1998.

---

Childs, Birmingham, AL, Douglas M. Bates, Bobbie S. Crook, Dothan, AL, for Angelica Marie Harper.

David J. Middlebrooks, Albert Loring Vreeland, II, Lehr, Middlebrooks, Price & Proctor, P.C., Birmingham, AL, for Southeast Alabama Medical Center, Dean A. Griffin.

Charles Neville Reese, Reese & Reese, Daleville, AL, for Kenneth M. Cole.

## MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

This matter is before the court for consideration of defendants', Southeast Alabama Medical Center and Dean Griffin, motions for judgment as a matter of law filed November 17, 1995, document numbers 107 and 108, and December 5, 1995, document number 116. For the reasons stated below, the court finds that the motion for judgment as a matter of law filed November 17, 1995, and renewed on December 5, 1995 are due to be granted.

## I. INTRODUCTION

Plaintiff, Angelica Marie Harper, filed this action against her employer, Southeast Alabama Medical Center (hereinafter referred to as "Southeast"), Kenneth E. Cole, individually and in his official capacity as her supervisor, and Dean A. Griffin, individually and in his official capacity as Southeast's human resource director, alleging that she was subjected to differential treatment, retaliation, wrongful termination and a hostile work environment because of her gender. In the complaint, plaintiff alleges causes of action under the first and fourteenth amendments of the United States Constitution as enforced by 42 U.S.C. § 1983; gender discrimination and retaliation under 42 U.S.C. § 2000e *et al.*, commonly referred to as Title VII; and state law claims for assault and battery, invasion of privacy and intentional infliction of emotional harm. Plaintiff later decided not to pursue her first amendment claim. Defendant Southeast Alabama Medical Center was granted summary judgment on plaintiff's Section 1983 cause of action alleging that she was denied due process and on plaintiff's

Samuel Fisher, Ann C. Robertson, Laura M. Hitt, Gordon, Silberman, Wiggins &

state law intentional infliction of emotional harm claim. Additionally, each of plaintiff's claims against defendant Griffin in his individual capacity was dismissed. Accordingly, this matter proceeded to trial against Southeast on plaintiff's Title VII claim alleging that she was sexually harassed, and subjected to a hostile work environment and retaliation because of her gender, and against all of the defendants on the fourteenth amendment equal protection under the law claim and state law claims alleging invasion of privacy and assault and battery.[1]

## II.  EVIDENTIARY SUMMARY

In the course of the trial of this action, the jury heard testimony from plaintiff, Griffin, Cole, Paul Allen Golson, the chief operating officer for Southeast during plaintiff's employment, plaintiff's co-workers and other hospital staff and managers. Plaintiff also presented James Gruber, Ph.D., a social psychologist specializing in sexual harassment, as an expert witness. In addition to presenting evidence through witnesses offered by plaintiff, Southeast presented testimony addressing its efforts to find plaintiff another position within the hospital and the circumstances related to her termination.

### A.  The Allegations

Plaintiff began her employment at Southeast in November, 1988. She was hired as a secretary and transcriptionist for the lab department. Defendant Cole was the manager for the department and plaintiff's immediate supervisor. Plaintiff's duties included providing secretarial support for Cole, transcription for several doctors and general office duties for the lab, i.e. ordering supplies, contacting vendors for repairs and assisting with payroll for lab employees.

Initially, plaintiff considered Cole a good supervisor and enjoyed working with him. They would joke around with one another but plaintiff did not find their exchanges offensive. Plaintiff even describe Cole as her friend at one point.[2] Other laboratory staff members called as witnesses by each party testified that, at times, the atmosphere in the lab, and at outside recreational activities, diminished to banter that included sexual references and suggestive innuendos.[3] Plaintiff's witnesses testified that everyone joked around. At the trial, plaintiff denied that she ever told any jokes that had a sexual connotation. However, in a written statement that plaintiff provided to Southeast for its investigation, she claimed "I stopped telling dirty jokes several months before.... [S]ince August 1991 ... I refused to participate in these jokes anymore."[4] Defendants' witnesses testified that they only heard plaintiff tell inappropriate jokes.

Plaintiff contends that Cole's interaction with her changed after she returned from maternity leave in October, 1989. While on maternity leave, plaintiff went to the lab to pick up her paycheck. She was upset because she was having difficulties with her husband and suffering from "baby blues." According to plaintiff, Cole saw that she was upset and asked her what was wrong. Since plaintiff was crying she just blurted out her difficulties with her husband and discussed the matters with Cole. When plaintiff returned to work from her maternity leave, she found that Cole engaged in more personal conversations with her about his relationship

1. In accordance with *Fed.R.Civ.P.* 73 and 28 U.S.C. § 636(c), the parties consented to conduct all further proceedings, including trial and order of entry of final judgment, before a magistrate judge. See Consent to Exercise the Jurisdiction of a Magistrate Judge and Order of Reference filed March 30, 1995.

2. Plaintiff's Trial Exhibit 6—Handwritten Statement by Angie M. Harper dated March 4, 1992.

3. Plaintiff and Cole as well as other members of the laboratory staff played in softball and volleyball leagues. Plaintiff and her coworker Amy Aikens Hamilton testified that at one of the volleyball games Cole told plaintiff that she should remove her sweatshirt to distract the other team.

Hamilton had removed her sweatshirt because the gym was warm. Southeast also sponsored a community run for which plaintiff and Cole were on the organization committee. Plaintiff testified that she eventually stopped working on the committee so that she would not have to interact with Cole as much. She also testified that Cole once amended the committee notes she typed for him to indicate that she would model the t-shirt for the event wet down. Plaintiff testified further that when she asked Cole what he meant by that he responded that he was joking.

4. Plaintiff's Trial Exhibit 6, *supra*, n. 2.

with his wife including references to their sex life and plaintiff's sexual interaction with her husband.

Plaintiff maintains that shortly after returning from maternity leave, Cole asked her to meet him at a local park because he needed someone to talk to but he did not feel comfortable talking to her at the hospital. Plaintiff testified that she eventually agreed to meet Cole at the park. They arrived at the park separately late in the afternoon. According to plaintiff, their conversation at the park began with discussions about work. As they continued to walk farther into the park on a trail, Cole began discussing matters concerning his wife including comments that she was not affectionate. Eventually, plaintiff and Cole stopped walking and sat on a bench near the aquarium. Plaintiff testified that while sitting on the bench Cole put both of his arms around her shoulder, pulled her to his chest and cleared her hair off her shoulder. At that point, plaintiff jumped up and began walking back to her car, telling Cole that she had to leave to pick up her children. Although Cole followed her as she left, plaintiff says that he expressed concerns about being seen with her as they got farther along the trail back toward their cars. Once she reached her car, plaintiff got in and told Cole she would see him at work the next day.

Plaintiff testified that she was very nervous about working with Cole after the park incident. She told a co-worker about the incident and asked the co-worker to sit with her so that she would not be left alone at the office with Cole. Plaintiff did not discuss the matter with Cole until a few days later. At that time she told him that she was uncomfortable with what happened at the park and emphasized that their relationship could not be any more than a friendship. According to plaintiff, Cole apologized for the incident and said that it would not happen again.

Cole contends that plaintiff asked him if they could go some place outside the office so they could talk without interruption. Cole testified that plaintiff suggested that they go to bar but he felt that would have been inappropriate. He suggested the park because it was a convenient location. Cole maintains that when he and plaintiff sat, he only massaged her shoulders because she was complaining about tension and he had given her a neck massage on occasions. According to Cole, as he and plaintiff walked back to their cars, they put their arms around each other "buddy-like," and then hugged each other goodbye at her car.[5] Cole admitted that he expressed to plaintiff that he was nervous about being with her at the park. He also admitted that he was flattered that plaintiff confided in him. However, he maintains that he did not discuss any more than a passing comment about his wife, and only after plaintiff asked him about her.[6] Cole denies that plaintiff ever told him, at that time or later, that she was uncomfortable with what had transpired between them at the park.

After the park incident, plaintiff testified that she believed that relationship with Cole was "ok" for a while but then he began touching her again by resting his hand on her shoulders, rubbing her neck or holding her hand when she gave him a message. Plaintiff admits that while there were times when she allowed Cole to message her temples or neck to relieve her tension headaches, after the park incident, she did not consent to such touching or elicit Cole's assistance in that regard in any way. Another specific incident that plaintiff testified about was when Cole tried to kiss her on her birthday in October 1991. Plaintiff was able to move away from Cole to avoid that kiss. Plaintiff also testified that sometimes when leaving the office Cole would suggest that they to go to a hotel and that he insinuated other men who asked her to lunch had ulterior motives. Plaintiff testified that these comments annoyed, embarrassed and angered her. Plaintiff also complained that Cole rated her a "4" out of five for grooming and appearance on her performance evaluations because she did not wear enough dresses. Plaintiff contends that as a result of her challenging Cole on this rating for her 1990–1991 evaluation, Cole changed the rating to a five. Plaintiff received fours in other areas of her evaluation, however, she did not challenge those ratings.

---

5. Plaintiff's Trial Exhibit 38—Handwritten Statement by Ken Cole dated March 4, 1992.

6. *Id.*

Cole testified at trial that he did not suggest to plaintiff that she should wear more dresses but merely required a professional appearance. He also testified that he once had to counsel plaintiff about her wearing a low-cut dress that showed a tattoo on her breast.[7] One of plaintiff's co-workers also testified on direct examination that Cole advised her to wear dresses more often. On cross-examination, however, the witness testified that Cole only required a professional appearance.

Southeast presented evidence that plaintiff continued to exchange humorous cartoons and caricatures with Cole after the park incident. One exchange included a reference to Cole as a "such a babe" and asking if he was from "babe-alonia." Cole responded, "an excellent babbling babe!" [8]

In February 1992, plaintiff decided that she should recognize Cole's birthday by giving him a token gift. According to plaintiff, at the time that she gave Cole the gift he simply thanked her. Later that day, as plaintiff was attempting to leave, Cole grabbed her in a hug and tried to kiss her on the mouth. Plaintiff was able to turn her head so that Cole ended up kissing her cheek. Plaintiff testified that she was shocked by Cole's behavior and just left the office. Cole maintains that the birthday hug, which was brief and not embracing, was merely a manner of thanking plaintiff for the gift and that she moved toward him when he extended his arms. Cole denies that he kissed plaintiff or that he attempted to kiss her.

The week following the birthday incident plaintiff was scheduled to work in another department. When plaintiff returned to the laboratory the next week, she confronted Cole that Monday morning. Plaintiff secretly tape-recorded this confrontation. The transcript of the tape was entered into evidence without objection from any party. The transcription disclosed the following conversation:

K   Good morning, Angie.

A   Hi. We need to talk.

K   Okay.

A   Um, you know, I've been holding this in all week and I have been ill all last week because you told me that you were gonna "try better" to keep you hands off of me, and, Friday on your birthday, I mean, whenever you tried to kiss me or whatever you tried to do, that was just ... that was, the last straw for me. I mean, you told me several times you're gonna try to get better, you're gonna try to get better and it's driving me crazy. I can't do my work, I, I can't sleep, I can't do nothing and I've asked you several times to just keep your hands off and I just can't understand why you can't do that.

K   I can do it.

A   Well, I, I just ... why do you keep doing this?·

K   I don't know. I guess I ... I don't know ...

A   Well, anyway, you don't understand what kind of effect ... interrupt.

K   I guess I ... I guess I probably, I don't. I guess I don't. I just though [sic] it was an innocent birthday hug. I don't know.

A   Well—

K   I didn't know it would cause problems.

A   No! You know several times we have talked about this and you know that I just do not want to be touched. And, and, and you know, the hug ... that's one thing, but when you turned your head to try to kiss me on the cheek or whatever, that, just did it for me because you know how I feel about that. And I just can't take it anymore. I couldn't hardly sleep last night just thinking about coming in here and tackling you about this. I mean, you have a family and I have a family ...

K   Yeah.

A   And I love my husband and, and this is causing problems between me and him because I can't, I can't, I can't even

**7.** *Defendants also presented testimony from other lab staff who described a genie costume that plaintiff wore to the lab for Halloween as provocative. Plaintiff wore the costume in court, there-* fore, the jury was able to reach its own conclusion about the costume.

**8.** Defendant's Exhibit 50.

hardly let him get near me, because everytime [sic] he touches me I think about, when you just get near me and, and all last week when I saw you it just made me angrier and angrier and I just can't take it. I cannot take it anymore.

K Okay. Well, I promise you I will not ...

A Well, how do I know you're gonna keep your promise because ...

K I don't know. I already know, I mean ...

K I see how you are, I just don't have no [sic] idea that you got that upset.

A Well, all I can say is I tried to be nice about it and uh ... driving to work I was just filled with, with so much disgust and anger that, I, I just about wrecked my car, that's how upset I was.

K No, I have no idea. I mean, I completely forgot about it. I guess I probably didn't think you would do anything that would _____ I didn't do it because I was in love with you, or anything like that, I just, you know ...

A Well, I think you've got a short memory because, like I said, we've talked about this before, this has been going on since, it's been going on since the Landmark Park thing, you know, and I don't know what else I can do to stop it. I'm trying to keep this between us and I don't want it to happen again because if it does, then it's gonna have to be somebody else than, other than me and you because I, emotionally I can't take it anymore.

K Okay.[9]

After the discussion with Cole, plaintiff returned to her desk and made an appointment with Golson, Southeast's chief administrative officer and Cole's supervisor, to discuss the difficulties she was experiencing with Cole. Plaintiff met with Golson as scheduled.[10] When Golson realized that plaintiff wanted to discuss matters related to sexual harassment he called Griffin to sit in on the meeting. Griffin asked plaintiff questions about the nature of her complaints, and her and Cole's relationship. Golson and Griffin then left the plaintiff in the office. When they returned a short time later, they advised plaintiff that she would be put on administrative leave with pay so that the matter could be investigated. Griffin then met with Cole to inform him of the charges that had been made against him.

### B. Investigation of Plaintiff's Complaint

Griffin's investigation consisted of interviews with plaintiff and Cole, and the written statements each provided. After providing Griffin with his written statement, Cole also gave him an unquestionably offensive sexual cartoon that was folded into a card with "Happy Late Birthday ..." written on the outside. Cole said plaintiff gave it to him. Although plaintiff denied giving Cole the card during her deposition, at trial she testified that Cole had probably given her the card first and that she returned the cartoon to him as a card to offend him as he had offended her.[11] As a result of the investigation, Golson sent Cole a letter advising him of Southeast's determination. The letter in its relevant part stated:

After thorough consideration, it has been determined that there were some improprieties on your part with regard to your working relationship with Ms. Harper. Certain actions and behaviors on your part were not only serious errors in judgement, but may also be considered violations of our policy on sexual harassment.

Therefore, you may consider this a warning with regard to the aforementioned behaviors. These types of behavior and/or actions will not be tolerated in the future. Any further occurrences will result in disciplinary action up to and including termination of your employment.[12]

9. Plaintiff's Trial Exhibit 36.

10. According to Southeast's records, this meeting occurred on March 4, 1992. See Plaintiff's Exhibit 3, Response to Equal Employment Opportunity Commission dated June 16, 1992.

11. There is no indication that Griffin questioned plaintiff about the card at the time of his investigation.

12. Plaintiff's Exhibit 8, Letter to Cole from Golson dated March 9, 1992.

The letter also was included in Cole's personnel file. Griffin considered the letter to be disciplinary action. Griffin also testified at trial that while Southeast had a progressive disciplinary process, he conveyed to Cole that his interaction with plaintiff was a very serious departure from the sound judgment expected of a supervisor and that any further offenses of this nature by him would result in termination.

Griffin advised plaintiff that while no disciplinary action would be taken against her and she was not considered responsible for Cole's action, the investigation indicated that she also engaged in improprieties in her interaction with Cole, specifically, by telling jokes with sexual connotations. Griffin also advised plaintiff that "appropriate action was taken" against Cole to deter him from engaging in such offensive behavior in the future. At that time, Griffin gave plaintiff the option of returning to position in the laboratory with Cole as her supervisor or working in another department. Plaintiff refused to return to her prior position because she was uncomfortable working with Cole again. Plaintiff also disputes that she was offered comparable positions. Plaintiff contends that the other positions were not a viable option for her primarily because she would have to work different hours. Since plaintiff did not take any of the positions that she was offered after Southeast considered her complaint to be resolved, she was placed on administrative leave without pay.

By July, 1992, plaintiff still had not been offered a position that she considered acceptable. On July 24, 1992, plaintiff was advised that she was terminated, effective that day, for submitting a letter to the Houston County Sheriff's Department on Southeast letterhead over Dr. Patrick Jones's signature without authorization or permission from Southeast or Dr. Jones.[13]

In September, 1992, Cole was advised that his job performance at Southeast was not satisfactory and he should consider "a career change." Cole resigned shortly thereafter.

## C. Prior Training and Policy Regarding Sexual Harassment

Sometime in 1988, Southeast retained the services a of private employment service to conduct several management workshops in a program called "preventative employment medicine." According to the participant's manual for the workshops sexual harassment and hostile work environment were among the topics covered. The manual includes an advisory to supervisors and those who have managerial authority, to

—avoid engaging in *any* sexually oriented conduct with employees including: provocative comments about appearance; jokes or banter which have sexual components; inquiries to employees of the same or opposite sex about their personal sexual habits;

—refrain from displaying or posting sexually oriented material such as calendars, posters or cartoons[14]

The manual also advises that employers may be vulnerable in litigation if a manager has

—persistently told sexually oriented jokes;

—made explicit and/or sexually suggestive comments about employees' attire or romantic lives;

—attempted to or in fact participated in romantic relationships with employees;

—expressed a sexual interest in particular employees to co-workers *or* other managers.[15]

Finally, the manual states that "to avoid becoming involved in sensitive claims" remember:

if an employee objects to sexually oriented conduct it must be stopped immediately even if the employee previously participated in or initiated such activity; if a manager *continues* to engage in sexually oriented behavior after being asked to stop, he/she may be violating the law. The *wisest* course is to avoid engaging in such conduct

---

**13.** Dr. Jones is the Medical Director for the Pathology Department at Southeast.

**14.** Defendant's Exhibit 53—Preventative Employment Medicine, Participant's Manual at 15.

**15.** *Id.* at 16.

so that it cannot later be used as evidence suggesting discriminatory attitudes.[16]

According to Griffin, the workshop was set up for all management personnel, which included Cole's position. Griffin testified that it was his expectation that the managers would attend the training session and conduct workshops or "in-services" within their departments. Griffin did not have any record or means of determining whether such department programs occurred. Cole recalled attending a half day training session that addressed a number of employment issues but he did not have a specific recollection of topics concerning sexual harassment. Cole also testified that he did not conduct any training sessions on sexual harassment with his staff.

Southeast's employee handbook included an equal opportunity provision which stated:

> Southeast Alabama Medical Center's equal employment opportunity policy requires that there not be discrimination for reasons of race, religion, color, age, sex, national origin, or in the case of handicapped persons, personal disabilities. All employees and applicants for employment will be treated the same in all respects on the basis of their merits without regard for race, religion, color, age, sex, national origin, or handicap.
>
> The Medical Center does not and will not permit employees to engage in discriminatory practices or sexual harassment involving patients, visitors, or their co-workers. Any employee who believes he or she has been harassed by a coworker or supervisor should promptly report the facts of the incident or incidents and the names of the individuals involved to the supervisor or to the personnel department.

Plaintiff's expert, James Gruber, Ph. D., testified that this policy was insufficient be-

cause it did not address sexual harassment specifically. According to Gruber, an appropriate policy would include a definition of sexual harassment that is given context in the particular workplace, in this instance, in the context of a hospital. Gruber also criticized the policy because it did not include a statement that any complaining employee would be protected from retaliation. Gruber also maintains that there should be a number of individuals and offices specifically identified by name as places where a complaint concerning sexual harassment could be made. Gruber also believes that it is inadequate to merely include sexual harassment policy in an employee handbook. It is his opinion that any statement addressing sexual harassment should be posted and widely publicized, and distributed among employees periodically. Gruber also advocated employee seminars to address topics related to sexual harassment.

Gruber was also critical of the way the Griffin conducted the investigation of plaintiff's complaint. Gruber felt that it was inadequate not to interview other individuals,[17] and that just as Cole was allowed to present additional information after his interview and statement, plaintiff should have been given the same opportunity. Gruber also testified that Southeast failed to adequately assure plaintiff that she would be protected from retaliation for making her complaint.

By February 1994, Southeast revised its policy statement on sexual harassment. The new policy statement included a definition of sexual harassment; the identity of five individuals or offices to whom complaints of sexual harassment could be made; and, a statement against retaliating against any individual who makes a legitimate complaint of sexual harassment. The new policy also stated that all complaints would be forwarded to the Personnel Director for investigation.[18] Shortly after enacting the

---

16. *Id.* at 17.

17. Griffin testified that although plaintiff told him that other individuals had witnessed some of the events she complained about he did not consider them as "witnesses" per se.

18. The new policy in its entirety states:

SEXUAL HARASSMENT

It is the policy of Southeast Alabama Medical Center to recognize the right of every employee to participate and function in a non-threatening work environment free from sexual harassment and from discrimination on the basis of sex.

Sexual harassment is defined as, but not limited to, making unwelcome sexual advances, requests for sexual favor, or other conduct of a sexual nature when:

1. Submission to such conduct is made a condition of employment or advancement,
2. Submission to or rejection of such conduct is used as a basis for employment decision (compensation, terms or conditions of em-

new sexual harassment policy Southeast conducted in-service sessions with all departments in the hospital to review this policy as well as a drug and alcohol abuse policy. At the time of trial, Griffin testified that the new sexual harassment policy had been disseminated and reviewed with all Southeast employees.

### D. The Verdict

The jury returned a verdict in favor of plaintiff and against Cole and Southeast on the Section 1983 fourteenth amendment claim.[19] In response to special interrogatories, the jury advised that its finding in favor of plaintiff and against Southeast on the fourteenth amendment claim was based on Cole's sexual harassment of plaintiff and Southeast's failure to adequately train its staff about matters related to sexual harassment. The jury awarded plaintiff $4,000 for lost earnings and $4,000 punitive damages on the fourteenth amendment claim. Southeast prevailed on the invasion of privacy claim, and the Title VII sexual harassment and retaliation claims. The jury also found that plaintiff failed to establish her invasion of privacy claim against Cole, but found Cole liable for assault and battery against plain-

tiff. The jury awarded plaintiff $100 punitive damages on that claim. Judgment was entered in accordance with the jury verdict and costs were taxed against defendants.

### III. PENDING MOTIONS

At the close of plaintiff's case in chief, Southeast and Griffin moved for judgment as a matter of law pursuant to *Fed.R.Civ.P.* 50(a) arguing that there was insufficient evidence to support plaintiff's claims, including her claim that Southeast failed to provide adequate sexual harassment training to its supervisors.[20] The court reserved ruling on the motion until after the verdict. After the verdict, defendants again moved for judgment as a matter of law, or in the alternative, to alter or amend judgment pursuant to *Fed. R.Civ.P.* 59(e).[21] The parties filed submissions on the motions,[22] and the matter is now ready for resolution.

#### 1. Standard of Review

■ Judgment as a matter of law is available if there is "no legally sufficient evidentiary basis" for a reasonable jury to find in favor of the prevailing party. *Fed.R.Civ.P.* 50(a)(1). Therefore, the fundamental ques-

---

ployment, evaluations, etc.) affecting the individual, or

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Any employee of the Medical Center who believes that he/she has been or is being subjected to sexual harassment must report the alleged incident as soon as possible to one of the following: Immediate Supervisor, Department Head, Administrative Contract, Personnel Director, or Administration. It will be considered a violation of this policy for any retaliation or inappropriate action to be directed toward an employee who makes a legitimate complaint of sexual harassment. Such reports should be immediately forwarded to the Personnel Director who will initiate an immediate investigation into all such complaints received. Any employee found in violation of this policy after appropriate investigation will be subject to progressive disciplinary action, up to and including termination of employment. The individual who reports alleged sexual harassment will be given information as to the status of their report and the outcome of any investigation or action taken in their care. Plaintiff's Trial Exhibits 10 & 37.

**19.** Since Griffin was subject to liability in his official capacity only, he and Southeast were treated collectively at trial and continue to be treated collectively in the court's consideration of the pending motions. *See Brandon v. Holt,* 469 U.S. 464, 471–472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Monell v. Dept. of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (suit against individual in his "official capacity" and the entity he represents are essentially the same). *See also* Order entered March 10, 1995 at n. 4.

**20.** See Document Numbers 107 and 108 at ¶¶ 34 & 35.

**21.** See Document Number 116.

**22.** On July 24, 1997, Southeast, without leave of court, filed "supplemental authority," Document Number 141, citing *Sewell v. Town of Lake Hamilton,* 117 F.3d 488 (11th Cir.1997) as further support for their motion for judgment as a matter of law. Since this submission is not timely, the court will not consider the arguments presented. However, since a court is bound by any relevant case law that is issued prior to its decision, *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the court is not precluded from considering *Sewell* as relevant authority.

tion that the court must resolve is whether, under the applicable law, there is substantial evidence such that reasonable people, in the exercise of impartial judgment, could have concluded as the jury did. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir. 1997).

■ The party moving for judgment as a matter of law must demonstrate that there was not substantial evidence from which a reasonable jury could infer that the prevailing party satisfied her burden of proof as required under the applicable law. *Combs,* 106 F.3d at 1543. *See also Watkins v. Bowden,* 105 F.3d 1344 (11th Cir.1997). The court must view all of the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 805 (11th Cir.1995); *MacPherson v. University of Montevallo,* 922 F.2d 766, 770 (11th Cir. 1991). If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the court should grant the motion for judgment as a matter of law. *Combs,* 106 F.3d at 1526 (*quoting Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)). If there is substantial evidence such that reasonable and fairminded persons, in the exercise of impartial judgment, might reach different conclusions, the court must deny the motion. *Id. See also MacPherson,* 922 F.2d at 770. A " 'mere scintilla of evidence,' " however, is not legally sufficient. *Walker v. NationsBank of Florida N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995) (*quoting Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989)). Finally, the court also must be mindful not to reweigh the evidence or reassess credibility determinations. The resolution of such issues is within the province of the jury and should not be disturbed by the court merely because it would have reached a different conclusion. *Walls v. Button Gwinnett Bancorp, Inc.,* 1 F.3d 1198, 1200–1201 (11th Cir.1993). *See also Combs,* 106 F.3d at 1531 (Court commented that Judge Johnson correctly observed in his concurring opinion in *Walker,* 53 F.3d at 1563,

that in considering a motion for judgment as a matter of law, the court exceeds its authority if it decides whether evidence of pretext supports an inference of intentional discrimination because resolution of that issue requires evaluating the credibility of witnesses and weighing of evidence which is the jury's function.)

2. Discussion and Application of the Law

■ The fundamental law underlying plaintiff's fourteenth amendment claims is well established: a female employee has a constitutional right to be free from an abusive work environment. *Cross v. Alabama,* 49 F.3d 1490, 1507 (11th Cir.1995). If this right is violated in the course of one's employment with a public entity, the employee has a cause of action under 42 U.S.C. § 1983 ("Section 1983") for violation of her fourteenth amendment right to equal protection under the law. *Id.* Where an employee alleges an equal protection claim based on sexual harassment by a co-worker or supervisor, the employer itself, as opposed to the offending co-worker or supervisor, may be subject to direct liability only if its own actions caused the alleged violation. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).[23] *See also Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability against the employer cannot arise merely because it employs a tortfeasor. *Monell,* 436 U.S. at 692 (public entities cannot be held liable under Section 1983 on a respondeat superior theory). *See also Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). Therefore, in order to prevail against the employing entity, the plaintiff must show that the employer, through its deliberate conduct, was the "moving force" behind the injury suffered. *Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). *See also Pembaur v. Cincinnati,* 475 U.S. 469, 483–484, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion).

---

**23.** Although *City of Canton* and related cases discuss municipal liability, the analysis used in those cases is applicable to assessing whether

liability exists for "quasi-public" entities. *See Greason v. Kemp,* 891 F.2d 829, 837 (11th Cir. 1990).

■ In this action, plaintiff contends that Southeast is directly liable for the sexual harassment that she suffered from Cole because Southeast did not properly train its employees on matters related to sexual harassment. See Plaintiff's Response to Defendants' Motion for Judgment as a Matter of Law filed March 28, 1996. See also Pretrial Order filed September 21, 1994 at 2. In order to state a claim for "failure to train," the plaintiff must show that the employer was *deliberately indifferent* to the constitutional deprivation that may result from the failure to provide needed training. *City of Canton*, 489 U.S. at 388–389 (emphasis added). A plaintiff demonstrates deliberate indifference only if she establishes a "strong likelihood, rather than a mere possibility" that the constitutional violation that she suffered resulted from the defendants' failure to train. *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1540 (11th Cir.1994). To satisfy this burden of proof the plaintiff must show that a training program was needed or that the training provided was inadequate and that the need to provide adequate training to avoid violations of a constituency's constitutional rights was so obvious that the failure to provide adequate training can reasonably be said to be deliberate indifference. *City of Canton*, 498 U.S. at 390. *Tittle*, 10 F.3d at 1539–1540.

■ Although the law can be simply stated, its application has led to much confusion among the courts. Recently, Justice Breyer observed that the "basic effort to distinguish between vicarious liability and liability derived from 'policy or custom' has produced a body of law that is neither readily understandable nor easy to apply." *Board of County Comm'rs*, 520 U.S. 397, 117 S.Ct. at 1401–1404 (Breyer, J., dissenting) (citations therein). The Court does advise, however, that " 'deliberate indifference' is a stringent standard of fault, requiring proof that the municipal actor disregarded a known or obvious consequence of his action." *Id.*, 117 S.Ct. at 1391. This circuit has adopted the Second Circuit's interpretation of *City of Canton*'s deliberate indifference standard.

It is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens.... *City of Canton* also requires a likelihood that the failure to train or supervise will result in the officer making the wrong decision. Where the proper response ... is obvious to all without training or supervision, then the failure to train or supervise is generally not "so likely" to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.

*Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998) (*quoting Walker v. City of New York*, 974 F.2d 293, 299–300 (2nd Cir.1992)). *See also City of Canton*, 489 U.S. at 390 n. 10. In *Walker*, the Second Circuit Court of Appeals enunciated three requirements that must be met to satisfy its interpretation of deliberate indifference. First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation. *Walker*, 974 F.2d at 297. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. *Id.* Finally, the plaintiff must show that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Id.* at 298. Upon satisfying these requirements, a plaintiff inherently establishes the fundamental element of deliberate indifference—knowledge of the inadequacy of the training and of the constitutional deprivations that will result from inadequate training. *Tittle*, 10 F.3d at 1539–1540. *See also Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064 (3d Cir. 1991) (as a predicate to establishing a failure to train claim, plaintiff must show that policymakers were aware of number of suicides in city lockup and either deliberately chose not to provide officers with training in suicide prevention or acquiesced in longstanding practice or custom of providing no training in this area.); *Thelma D. by Delores A. v. Board of Educ.*, 934 F.2d 929, 934 (8th Cir. 1991) (demonstration of either actual or constructive notice of the inadequacy of a training program is necessary to show deliberate indifference).

In this action, plaintiff contends that Southeast had sufficient notice not only that its training on sexual harassment was inadequate but also that the inadequacy of training was likely to result in a violation of its employees constitutional right to work in an environment free of sexual harassment because other employees at Southeast had filed complaints of sexual harassment. Plaintiff presented evidence at trial that formal complaints by female employees alleging sexual harassment had been filed on June 11, 1991, October 24, 1991, and December 22, 1991.[24] The June 11, 1991 incident alleged that a male anesthetist made "off colored jokes and/or comments" and inappropriately touched a female nursing student on the buttocks. This matter was resolved by the Southeast's Director of Anesthesia who consulted with the parties involved and placed a written counseling notice in the offending employee's file. The October 24, 1991 incident involved a male patient care assistant, commonly known as an orderly, making inappropriate comments and personal inquiries to a female nursing student. This matter was addressed by the Associate Administrator of Nursing and Griffin. The offending employee was directed to discontinue the offensive behavior and a written warning was placed in his personnel file. The December 22, 1991 incident involved a female licensed practical nurse and male patient care assistant. The patient care assistant was accused of making solicitous remarks, and forcibly and offensively touching the complainant. Griffin and the Associate Administrator of Nursing also addressed this matter with assistance from the head nurse. Following the investigation, the offending employee was terminated.[25] Based upon these three incidents of sexual harassment which occurred between June 11, 1991 and December 22, 1991, plaintiff argues, that Southeast knew or should have known that its training and policies addressing sexual harassment were inadequate.

Although the number of incidents necessary to impute liability for failure to train need not occur with the frequency necessary to establish a pervasive pattern, the prior incidents must be sufficiently related in time and circumstances to the conduct giving rise to the pending action. Therefore, if a plaintiff contends that a defendant should have known of the need for training based upon the occurrence of prior incidents, there should be a direct link between the conduct giving rise to the pending complaint of constitutional violation and the prior incidents. *See, e.g., Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556 (11th Cir.1989) (force reports prepared by canine unit officers and reviewed by supervisory officials indicating that since 1981 canine assisted apprehensions resulted in dog bites in about one of two instances, as well as evidence of five prior excessive force lawsuits against a canine officer, were sufficient notice that corrective action in the canine unit was necessary); *Rivas v. Freeman,* 940 F.2d 1491, 1495–1496 (11th Cir.1991) (evidence that sheriff knew of prior instances of mistaken identity, along with his failure to properly account for incarcerated suspects, subjected Sheriff Freeman to liability under section 1983 for failure to adequately train his officers regarding reliable identification techniques); *Hurst v. Finley,* 857 F.Supp. 1517, 1522–1523 (M.D.Ala.1994) (since failure to train about requiring field sobriety test prior to detainment and detention of a driving under the influence of alcohol suspect are proximately related, plaintiff established link between failure to train and her alleged constitutional deprivation, arrest without probable cause.) The failure to establish such a link is fatal to any plaintiff's failure to train claim as a matter of law. *See, e.g., Sweatt v. Bailey,* 876 F.Supp. 1571 (M.D.Ala.1995); *Floyd v. Waiters,* 831 F.Supp. 867 (M.D.Ga.1993). In fact, the failure to establish such a link in this action, is a

---

**24.** Plaintiff's Exhibits 62, 63 and 64—Summaries of allegations of sexual harassment complaints and hospital's response prepared by Griffin in response to inquiry from EEOC regarding plaintiff's charge.

**25.** Griffin testified that he considered the December 22, 1991 incident to be different than the

others and warranting termination of the offending employee because the offending employee had a prior problem with alcohol and the complainant alleging sexual harassment believed that the offending employee had an odor of alcohol on his breath at the time that he approached her.

defect that is fatal to plaintiff's failure to train claim in the pending action.

■ In this action, the prior incidents of sexual harassment relate to situations that occurred in a department of Southeast that is separate and distinct from the Lab Department where plaintiff worked. The prior incidents did not involve any personnel that worked in the same department as plaintiff or Cole. The prior incidents each involved individuals involved in patient care. Even in generic terms, plaintiff's circumstance differs from the prior incidents because those matters involved harassment by co-workers, not harassment by a supervisor as plaintiff experienced. Neither of the prior incidents involve a department manager or a supervisor-supervisee relationship. Therefore, if Southeast had developed a training program in response to the prior incidents it would not have been unreasonable for it to limit such training to the departments where the incidents occurred, or simply to staff members and not supervisors since there was absolutely no notice that, prior to plaintiff's complaint, any supervisor engaged in or needed additional training related to sexual harassment. This distinction between staff members and supervisors is not unreasonable since as professionals, supervisors or managers are held to a heightened standard.          •

The court also agrees, as Southeast points out, that the occurrence of three prior complaints of sexual harassment at a facility that employs more than two thousand individuals does not establish such a high degree of predictability that situations of sexual harassment will be reoccurring absent training in that area. See Deborah O., By and Through Thomas O. v. Lake Central School Corp., 61 F.3d 905, 1995 WL 431414 *3 (7th Cir.1995) (table). More important, given the factual distinctions between the prior incidents and plaintiff's encounters, the court finds that, as a matter of law, three prior incidents of sexual harassment that occurred on June 11, October 24, and December 22, 1991, are not sufficiently linked to the circumstances that gave rise to plaintiff's constitutional injury. Accordingly, the court finds that since the link between the prior incidents of sexual harassment and plaintiff's alleged constitutional deprivation is too attenuated, plaintiff's failure to train fails as a matter of law because the evidence fails to meet the stringent standard of fault that is required.

Plaintiff also contends that evidence adduced at trial showed that Southeast had developed a more effective policy for addressing sexual harassment which demonstrates, plaintiff argues, that Southeast was aware that its sexual harassment policy during plaintiff's tenure was inadequate. According to plaintiff, evidence that Southeast represented to the EEOC that the new policy had been implemented also infers that Southeast was aware that its sexual harassment policy was inadequate. Again, this is more generous reading of the facts than the law allows. After plaintiff made her complaint, which according to the evidence at trial was the fourth reported incident of sexual harassment in ten months, Southeast was on notice that incidents of sexual harassment were not limited to the departments in the 1991 occurrences. Thus, with this information, Southeast properly enhanced its training on sexual harassment throughout its organization. Its change in policy does not create liability.

Additionally, plaintiff's contention that Southeast was on notice that sexual harassment was occurring within her department by her supervisor based on the response to an employee survey does not assist her claim. The employee comments on the survey wherein one of the comments about Cole was that "my supervisor thinks that he can sexually harass me" were not disclosed to Southeast personnel until after plaintiff made her formal complaint. According to the testimony at trial, which was not contradicted by plaintiff, the survey comments were forwarded to an independent company that compiled several statistics and results, and typed the comments before providing them to Southeast. Thus, even if an anonymous comment on a survey imputes knowledge to Southeast, since that disclosure was not shared with Southeast until after plaintiff made her formal complaint, it cannot be used to bolster plaintiff's failure to train claim.

■ Finally, plaintiff's contention that Southeast should have known about her harassment problems because she attempted

to find other assignments and transfers at the hospital also is inadequate. Absent an affirmative representation that such transfers were sought as a result of a harassing or hostile work environment, an employer cannot be deemed to know the true motive underlying such a request. *See Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir.1996) (request for transfer because of personality conflict does not notify employer of harassment by nonsupervisory employee). *See also, Kilgore v. Thompson & Brock Management Inc.*, 93 F.3d 752, 754 (11th Cir.1996) (complaint to manager not considered "high management" does not suffice as direct notice to company).

■ The law, as it has developed in this area, is very protective of public entities to prevent liability based upon the employment of tortfeasors or a theory of respondeat superior. Such protection for the public entity makes a plaintiff's burden of proof quite significant, and in some instances, probably insurmountable. However, with the state of the law as it is, the court finds that it is required to set aside the verdict in favor of plaintiff and against Southeast on the Section 1983 claim. Accordingly, defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) are due to be granted.

## IV. CONCLUSION

For the reasons stated above, the court finds that the motions for judgment as a matter of law filed by defendants on November 17, 1995 and December 5, 1995 are hereby GRANTED, and the court shall issue judgment accordingly. Furthermore, it is hereby ORDERED that the judgment entered in this cause on November 21, 1995 be and is VACATED.