Roderick MacPHERSON and Marvin Narz, Plaintiffs–Appellants,

v.

UNIVERSITY OF MONTEVALLO, Defendant–Appellee.

No. 89–7752.

United States Court of Appeals, Eleventh Circuit.

Jan. 30, 1991.

Joe R. Whatley, Jr., Franklin G. Shuler, Jr., Jeremiah A. Collins, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, Ala., John M. West, Bredhoff & Kaiser, Washington, D.C., for plaintiffs-appellants.

Carl E. Johnson, Jr., Birmingham, Ala., for defendant-appellee.

Before EDMONDSON and BIRCH, Circuit Judges, and RE *, Chief Judge.

EDMONDSON, Circuit Judge:

Appellants Roderick S. MacPherson and Marvin J. Narz, plaintiffs below, appeal the district court's disposition of their age discrimination suit against the University of Montevallo (the "University") brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* The complaint alleged that the University had discriminated against them with respect to their compensation because of their age, and sought damages, injunctive

---

* Honorable Edward D. Re, Chief Judge of the U.S. Court of International Trade, sitting by designation.

relief, and litigation costs and expenses, including attorney's fees.[1] The case was tried before a jury; and at the close of plaintiffs' case, the district court directed a verdict for defendant on one of plaintiffs' theories, disparate impact. The jury returned a verdict for plaintiffs on the disparate treatment theory and awarded damages, but the district court entered judgment not withstanding the verdict (j.n.o.v.) for defendants and, in the alternative, granted defendant's motion for new trial. MacPherson and Narz appeal the directed verdict against them on the disparate impact theory and the grant of defendant's motion for j.n.o.v./new trial. We affirm the directed verdict for the University on the disparate impact theory. On the disparate treatment theory, we vacate j.n.o.v. for the University but affirm the district court's grant of new trial.

## I. BACKGROUND

The University is a small state institution of higher education. The plaintiffs MacPherson and Narz are full-time associate professors of its College of Business.[2] MacPherson—who was born in 1937 and has a doctorate in marketing—started teaching at the University in 1973 as an assistant professor, was tenured in 1978, and was promoted to associate professor in 1981. Narz—who was born in 1936, has an undergraduate degree in accounting, is a Certified Public Accountant, and has a J.D. degree—started teaching at the University in 1978 as an associate professor; he is a professor of business law but has also taught accounting and taxation.[3] With the exception of one professor hired after the start of this litigation, plaintiffs are the oldest faculty members of the College of Business. They are also the longest-serving members of the faculty.[4] Nevertheless, MacPherson and Narz are the lowest paid members of the College of Business faculty, with the exception of an assistant professor who holds only an MBA (which is not considered a terminal degree) and an assistant professor who was hired in 1988 and does not have a Ph.D.

In 1979, Dr. William Word was hired as the Dean of the College of Business with a mandate from the University to obtain accreditation for the College of Business by the American Assembly of Collegiate Schools of Business ("A.A.C.S.B.").[5] His evaluation of the College of Business led to the conclusion that, to obtain accreditation, the University would need—among other things—to hire doctorally qualified[6] professors in accounting, finance, and management.[7] Since his appointment as dean, Word has hired 25 new faculty members, 17 under the age of 40 and 8 over the age

1. Plaintiffs based their age discrimination case on two different theories: disparate impact and disparate treatment. Briefly stated, the disparate impact theory of discrimination is that the employer uses some facially neutral, non-job-related employment practice which has a disproportionately adverse effect upon the members of a protected group. The disparate treatment theory is that the employer intends to discriminate against the members of a protected group and does so.

2. The faculty ranks at the University (lowest to highest) are instructor, assistant professor, associate professor, and full professor. Most of the hiring is done at the assistant professor level, at which level the University may hire a person with a master's degree (M.S.), a person who has completed the course work for a doctorate but has not completed his dissertation (A.B.D.), or a person who has finished his dissertation and has a doctorate (Ph.D. or D.B.A.).

3. In July 1989, he received an LL.M. in taxation.

4. Another professor hired at the same time as Narz has served as long as Narz.

5. The University has indicated that the A.A.C.S.B. is a prestigious institution which accredits select schools of business. A.A.C.S.B. accreditation enhances the ability of a school of business to raise funds, to attract faculty and students, and to place students upon graduation.

6. For purposes of A.A.C.S.B. accreditation standards, a professor is doctorally qualified if he holds a terminal degree in his teaching field. Such a professor is deemed qualified to teach any course within his field, regardless of the courses he actually teaches.

7. One of the reasons for A.A.C.S.B.'s no-visit response to the College of Business's first application for accreditation in 1983–84 was that the College of Business lacked a sufficient number of doctorally qualified professors in accounting and management. Another reason was the faculty's lack of research and publication.

of 40, for the purpose of achieving accreditation. According to defendant, this was necessary to obtain a sufficient number of doctorally qualified professors in the various business school fields and to obtain professors who are researchers and publishers of articles.[8]

A faculty member's compensation at the University is determined by the level of his beginning salary and raises realized through promotion, across-the-board increases, merit raises, and market adjustment increases. When additional funds become available for business school salaries (apart from promotion and market adjustment salary allotments), 70 per cent of the new money is distributed in across-the-board raises and 30 per cent is distributed in merit raises according to a formula based on the faculty member's annual evaluation score as compared to the average evaluation score in the College of Business. According to Dean Word, salary differentials based on merit raises are insignificant because the range of evaluation scores is not great. A faculty member's starting salary is based on a number of market-related variables which affect an applicant's desirability and, hence, the salary that universities are willing to offer the applicant. The main factor affecting a faculty member's initial salary is his field or discipline. After field or discipline, an applicant's research and publication records (and potential for additional publication) are the most important variables in determining his initial salary, in Dean Word's opinion.

## II.   STANDARDS OF REVIEW

The standard of review we employ in reviewing the district court's disposition of a motion for directed verdict or for j.n.o.v. is the same as that used by the district court to determine whether to grant either motion. District and appellate courts should consider all of the evidence in the light most favorable to the nonmoving party and with all reasonable inferences drawn in favor of the nonmover. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041,

1044–45 (11th Cir.1989) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969)). If the facts and inferences are so strong that the court believes that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict, the district court properly grants a directed verdict or j.n.o.v. *Id.* at 1045. If, however, the evidence is such that "reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions," it is improper for the district court to grant a directed verdict or j.n.o.v. *Id.*

Motions for new trial are within the sound discretion of the district court. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). Thus, an appellate court employs the abuse of discretion standard to review the district court's ruling on a motion for a new trial. *Verbraeken*, 881 F.2d at 1049. As we stated in *Rosenfield v. Wellington Leisure Products, Inc.*, this standard "recognizes the deference that is due the trial court's first-hand experience of the witnesses, their demeanor, and a context of the trial." 827 F.2d 1493, 1498 (11th Cir.1987). But we have also recognized that "we should more strictly scrutinize orders which *grant* new trials, where the basis for the order is that the verdict is against the weight of the evidence (as opposed to situations where there is new evidence, for example)." *Id.* (emphasis in original). The concern is that "the [trial] judge does not simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury." *Id.*

## III.   DISCUSSION

### A.   *The Disparate Impact Theory*

Appellants' disparate impact theory of discrimination is that the University's alleged practice of paying market rates of salary to new faculty hires, but not paying the market rate to incumbent professors, has a disparate impact on older people be-

---

**8.** These accreditation efforts came to fruition in 1987 when the University became the smallest public university in the United States to have a nationally accredited business program.

cause they tend to be the faculty members who have been at the University the longest. They contend that, because the University had not carried its burden of producing evidence of a business justification for this alleged practice, the district court erred in granting a directed verdict at the conclusion of plaintiffs' evidence.

■ Under disparate impact theory, discrimination can be established by proving that a facially neutral employment practice, which is unjustified by a legitimate business goal of the employer, has a disproportionately adverse impact on the members of a protected group. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 655–56, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989). It was developed "as a form of pretext analysis to handle specific employment practices not obviously job-related." *Spaulding v. University of Washington*, 740 F.2d 686, 707 (9th Cir.1984).

■ To make a prima facie case under the disparate impact theory, a plaintiff must isolate and identify "the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove*, 490 U.S. at 656, 109 S.Ct. at 2124 (quoting *Watson v. Fort Worth Bank & Trust Co.*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988)). The Supreme Court has said that causation is an important part of the disparate impact prima facie case: "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Id.* at 657, 109 S.Ct. at 2124. For a plaintiff to show that there is an imbalance is not enough. *Id.* at 657, 109 S.Ct. at 2124.

■ Once a plaintiff has established a prima facie case of disparate impact, the burden shifts to the employer to produce evidence to justify its use of the challenged practice.[9] When considering the employer's justification, "the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2125–26. An insubstantial justification will not suffice in this analysis, but "there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster." *Id.* at 659, 109 S.Ct. at 2126. While the employer bears the burden of production on its business justification, the burden of persuasion—and the ultimate burden of proving that the alleged discrimination has been caused by a specific employment practice—remains on the plaintiff at all times. *Id.* at 659, 109 S.Ct. at 2126.

■ If an employer successfully establishes that the challenged business practice significantly serves the employer's legitimate employment goals, a plaintiff may still be able to prevail if he can persuade the factfinder that an alternative practice exists which would meet the employer's legitimate goals without producing an adverse effect on the protected group. *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126. If the employer refuses to adopt the alternatives, the refusal "would belie [the employer's claim] that their incumbent practices are being employed for nondiscriminatory reasons." *Id.* at 660–61, 109 S.Ct. at 2126–27. But, the Supreme Court has indicated that just suggesting an alternative practice is insufficient to meet the plaintiff's burden: the alternative practice "must be equally effective as [the employer's chosen practice] in achieving [its] legitimate employment goals." *Id.* at 661, 109 S.Ct. at 2127. The burdens imposed on the employer—including cost—by the alternative practices are "relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals." *Id.* at 661, 109 S.Ct. at 2127 (quoting *Watson*, 487 U.S. at 998, 108 S.Ct. at 2790).

---

9. When one speaks of a prima facie case in the employment discrimination context, what is ordinarily meant is that enough has been shown to require defendant to produce some evidence. *Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285, 291 (8th Cir.1982); *see also Reeves v. General Foods Corp.*, 682 F.2d 515, 521–22 & n. 10 (5th Cir.1982) (prima facie case only creates rebuttable presumption and shifts burden to defendant to produce evidence).

■ We conclude that the district court properly granted the University's motion for directed verdict on the disparate impact theory at the close of plaintiffs' case.[10] First, we doubt that reasonable jurors could find that the University had a practice or policy of paying market rates to newly-hired faculty members but not to others.[11] Plaintiffs did establish that the University has a practice of paying market rates to newly-hired professors; they may not, however, have shown that the University has a practice of not providing market-based adjustments to the salaries of established professors. As MacPherson admitted, the University provides special salary adjustments—beyond across-the-board and merit raises—which are given for market reasons. He also admitted to having received such a market adjustment in 1981 or 1982; Narz also received a market adjustment at that time. Dean Word, called as a witness by plaintiffs, testified regarding market adjustments to salaries, which he said were based on the faculty member's specialty or discipline. To illustrate, he used the market adjustments granted in the 1988–1989 school year: in that school year, he gave market adjustments to three Ph.D.s in the accounting field and to two management professors who had computer training; he stated that adjustments for market conditions are "primarily based upon discipline. Whether one is in accounting, finance, et cetera. And how difficult it is to get these people and how much adjustment money [he] think[s he] can free up." In other words, the University's market adjustments are made to enable it to retain good professors in fields in which professors are in great demand.

We do not, however, base our decision in this case on our doubt as to whether plaintiffs sufficiently proved the practice they alleged. Assuming, for the sake of discussion, that plaintiffs established that the University has a practice of paying market rates to newly-hired faculty members but not to others, and that this practice has a disparate impact on older professors, we still agree with the district court's direction of the verdict on the disparate impact theory. MacPherson and Narz presented evidence tending to suggest that a practice of paying market-rate salaries only to new hires had disparate impact on older professors who were likely to have been at the University longer. But, the University's contention that there was a legitimate business reason for this practice—that the University had to pay market rates to attract and to hire good new faculty members— was undisputed by plaintiffs and admitted by plaintiffs' expert, Dr. Ignatin, on cross-examination. The University thus established, through uncontroverted evidence, that there was a legitimate business reason for this employment practice; no reasonable juror could find otherwise.

■ The sole evidence that MacPherson and Narz produced at trial for an alternative employment practice which would avoid the alleged disparate impact on older professors was Dr. Ignatin's testimony that "[t]he obvious alternative is you can pay market rates to everybody." R. 3–376. The district court concluded, as we read what the judge said when he orally granted the University's motion for directed verdict, that this sole statement was insuffi-

---

**10.** Despite the practice of having shifting burdens of production in employment discrimination cases, grants of directed verdicts for defendants at the close of plaintiff's evidence are proper even if the plaintiff has made out a prima facie case as long as plaintiff's case-in-chief also contains evidence sufficient to meet defendant's burden of production and the evidence overall at the close of plaintiff's case is insufficient to allow a rational jury to find for the plaintiff. *See Riordan v. Kempiners,* 831 F.2d 690, 696 (7th Cir.1987); *Ekanem v. Health & Hosp. Corp. of Marion Cty., Ind.,* 724 F.2d 563, 568 (7th Cir.1983); *Halsell,* 683 F.2d at 291–92;

*Douglas v. Anderson,* 656 F.2d 528, 533–34 (9th Cir.1981); *see also Young v. General Foods Corp.,* 840 F.2d 825, 828–29 (11th Cir.1988) ("the fact that a plaintiff has established a prima facie case does not in and of itself foreclose the possibility of summary judgment being granted in favor of the employer").

**11.** Plaintiffs rely on A.A.C.S.B. salary scales to establish the "market rates" for the average faculty member at a certain rank in a given discipline or field.

cient to meet plaintiffs' burden to prove an alternative.[12] We agree.

In *Wards Cove*, the Supreme Court showed that to meet plaintiffs' burden under a disparate impact theory, plaintiffs have to do more than suggest an alternative practice. The Court said that "any alternative practice ... must be equally effective as [the employer's chosen practice] in achieving [its] legitimate employment goals." 490 U.S. at 661, 109 S.Ct. at 2127. It indicated that one of the factors to be considered in determining whether the alternative is equally effective is the cost the alternative imposes on the employer. *Id.* at 661, 109 S.Ct. at 2127. Because " '[c]ourts are generally less competent than employers to restructure business practices,' ... the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative [employment practice]." *Id.* at 661, 109 S.Ct. at 2127 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978)). From this, we infer that the plaintiff in a disparate impact suit bears some burden of proving that plaintiff's suggested alternative practice is no more expensive than the employer's current practice, or—at the very least—that the practice is economically feasible for the employer.

Plaintiffs in this case never presented evidence to show that requiring the University to pay the A.A.C.S.B. "market rate" to longer-serving professors is economically possible for the University.[13] The evidence which was presented during plaintiffs' case suggests that such an alternative is infeasible. Both Dean Word and plaintiff MacPherson indicated that salaries had been frozen twice for periods of one year. In addition, Dean Word testified that the University is "in a limited budget situation"; that the University is in a poorer financial situation than public universities in other states; that "a lot of years we don't get raises at all"; and that, financially, "it is pretty tight." Therefore, we conclude that plaintiffs failed to meet their burden of demonstrating the existence of an equally effective, financially feasible, alternative practice that a rational jury could accept.

Assuming that plaintiffs adequately proved the alleged two-part practice (paying new hires at market rates and not paying others at market rates) of the University, we affirm the district court's decision to direct the verdict on the disparate impact claim for defendant University based on plaintiffs' failure to present an equally effective, alternative practice in the light of the University's proof of a legitimate business justification for its practice of paying new hires at market rates of compensation.[14]

**B.** *The Disparate Treatment Theory*

1. The Grant of J.N.O.V.

MacPherson and Narz contend that the district court erred in granting j.n.o.v. to

**12.** The district court also concluded that this evidence did not prove the existence of an alternative to the recruitment practice of paying market rates to new hires, but only provided a remedy for the alleged disparate impact of this practice. Because we find that the evidence was insufficient to meet plaintiffs' burden to prove an equally effective alternative, we do not reach this issue.

**13.** Therefore, we need not decide today whether an alternative practice that is economically feasible but is still more expensive than the employer's current practice can be "equally effective" within the meaning of *Wards Cove.*

**14.** Because we find that plaintiffs failed to meet their burden under a disparate impact theory of age discrimination, we have assumed—without deciding—that a disparate impact claim of age discrimination can be made where (as here)

plaintiffs allege a practice that encompasses more than one point in the employment process. *But see American Fed. of State, County, & Mun. Employees [AFSCME] v. State of Washington,* 770 F.2d 1401, 1405 (9th Cir.1985) ("[d]isparate impact analysis is confined to cases that challenge a specific, clearly delineated employment practice applied at a single point in the job selection process"). We have also assumed— without deciding—that a disparate impact claim of age discrimination can be made where (as here) plaintiffs allege a practice which is based on the market. *But see Spaulding,* 740 F.2d 686 (rejecting disparate impact theory of sex discrimination where employees received disparate compensation for work of subjectively equal value to employer but which do not command equal prices in market); *Lemons v. City & County of Denver,* 620 F.2d 228 (10th Cir.1980) (same); *AFSCME v. State of Washington,* 770 F.2d 1401 (same).

the University on plaintiffs' claim of age discrimination based on the disparate treatment theory because the record is such that a reasonable jury could have concluded that the University intentionally discriminated against them on the basis of their age.

Unlike the disparate impact model of discrimination, "disparate treatment cases necessarily require direct or circumstantial proof of discriminatory motive, whereas no such proof is required in disparate impact cases." *Spaulding*, 740 F.2d at 700; *see also AFSCME v. State of Washington*, 770 F.2d at 1405. A plaintiff employing circumstantial evidence to prove discrimination can establish a prima facie case of discrimination—by a preponderance of the evidence—using the four-part test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989). If the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant employer "to articulate some legitimate, nondiscriminatory reason" for the employer's action. Then, if the defendant employer meets that burden, the plaintiff must show by the preponderance of the evidence that the defendant's legitimate reasons were not the reasons that actually motivated its conduct, that the reasons were merely a "pretext for discrimination." *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). We have stated before that, at this last stage, the plaintiff must establish "by significantly probative evidence that the proffered reason is a pretext for discrimination." *Carter*, 870 F.2d at 584.

■ This Circuit has adopted a modified version of the *McDonnell Douglas* test to allow ADEA plaintiffs to establish a prima facie case of discrimination with circumstantial evidence. The prima facie case that plaintiffs would have to prove in this case of age discrimination in compensation would be that (1) they are members of the protected group of persons between the ages of 40 and 70; (2) they received low wages; (3) similarly situated persons outside the protected age group received higher wages; [15] and (4) they were qualified to receive the higher wages. *See Verbraeken*, 881 F.2d at 1045.

■ Here, plaintiffs established a prima facie case of age discrimination. In 1988, MacPherson and Narz were both in their early fifties. Plaintiffs presented evidence that, compared to most members of the College of Business faculty, they were poorly compensated. Their expert, Dr. George Ignatin, did a comparator analysis of their 1988 salaries.[16] He compared MacPherson, an associate professor in marketing with Professors Mikan and Hamilton, assistant professors of management,[17] both of whom were younger than he was and had less experience teaching; Ignatin found that MacPherson was paid less than Mikan and Hamilton. Ignatin compared Narz, an associate professor of business law/accounting, with Professors Rovelstad and Ryerson, younger assistant professors of accounting.[18] Narz was paid significantly less than they were. Plaintiffs also produced evidence regarding their evaluations, which were in the same range as the professors to whom they were compared: MacPherson's average evaluation over an eight-year period was 3.82 compared to Mikan's 3.75 and Hamilton's 3.91; Narz's

---

**15.** This part is treated with some flexibility. In some circuits, a plaintiff in a similar age discrimination case would only need to establish that a similarly situated younger person (including a younger person within the protected age group) received higher wages. *See Carter*, 870 F.2d at 582 n. 11 & 583 n. 14.

**16.** In a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the

plaintiff has been treated differently than others who are similar to him.

**17.** Associate professors outrank assistant professors. Although the fields of management and marketing are close with regard to salary scales, marketing professors, during most of the period at issue, commanded slightly higher salaries.

**18.** In terms of salary scales, the field of accounting is at the top of the business school salary range and business law is at the bottom.

evaluation average was 3.79, as compared to Rovelstad's 3.90 and Ryerson's 3.97.

To rebut the presumption of discriminatory motive that arises when an ADEA plaintiff makes out a prima facie case, the employer has "to articulate a legitimate non-discriminatory reason" for its actions. *See Carter,* 870 F.2d at 584; *Young,* 840 F.2d at 830. The employer must present "evidence which 'raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Stanfield v. Answering Service, Inc.,* 867 F.2d 1290, 1294 (11th Cir.1989) (quoting *Archambault v. United Computing Sys., Inc.,* 786 F.2d 1507, 1512 (11th Cir.1986) (quoting *Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207)).

The University presented legitimate non-discriminatory reasons for the disparities in salaries and presented evidence which called into question the evidence offered by plaintiffs. The University introduced evidence indicating that starting salaries, based on non-discriminatory market rates, led to any observed disparities; thus, increases in compensation were not responsible for these disparities. The University also stressed that starting salaries reflect the current market rate for the particular field or discipline, with accounting paying the most and business law paying the least.[19] In addition, the University presented evidence through the testimony of Dean Word that the evaluation scores—on which plaintiffs put emphasis—have little effect on salaries, apart from merit increases which represent only a small portion of post-hire salary increases. The University also cast doubt on the comparator analysis presented by plaintiffs. Dr. Ignatin admitted that the set of professors "show a lot of non-comparability"; that there are "some remarkable noncomparabilities" in terms of field/discipline, degree, and salary range; and that plaintiffs are "obviously not equivalent" to the people with whom they were compared.

The comparator analysis of MacPherson crossed two steps (rank and field) and neglected to examine the salary of another associate professor of marketing who was just four years younger than MacPherson and is well compensated. In addition, the University produced evidence that Mikan and Hamilton had management information system (M.I.S.) skills and that their salaries were established in the light of that training and their M.I.S. credentials because of the University's need for such skills in the A.A.C.S.B. accreditation process. On the comparator analysis of Narz, the University showed that Narz's field of business law is the lowest paying field in the College of Business while the compared field of accounting is the highest. The University suggested that Narz could not be considered half in the accounting field—despite the fact that he taught some accounting courses—because A.A.C.S.B. requirements dictate that in order to be considered qualified to teach any course in a given field, the professor has to be doctorally qualified, that is, the professor must hold a terminal degree in that field, which Narz does not. Moreover, the University presented testimony indicating that both MacPherson and Narz have failed to do significant research and publication, thus explaining part of the salary differentials. The University also presented the testimony of Dr. Baker, its expert economist, who stated that in doing a comparator analysis, an individual must be matched with persons having similar job-related characteristics who were similarly situated. She concluded that there were not enough similarly situated faculty members at the College of Business to do a comparator analysis.

Because the University pointed out legitimate, non-discriminatory reasons for the salary differentials, plaintiffs were required to show, by "significantly probative evidence," that the proffered reasons were merely a pretext for discrimination. *Carter,* 870 F.2d at 584. Plaintiffs could do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered ex-

---

**19.** The order of the fields or disciplines from highest paying to lowest paying is: accounting, finance, economics, marketing, management, and business law.

planation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Carter*, 870 F.2d at 584.

Certain evidence presented at trial by plaintiffs can be fairly said to cast a doubt on the University's proffered reasons for salary differentials and could be viewed by a reasonable jury as showing that the University's proffered explanations are unworthy of belief. Plaintiffs drew testimony from Dean Word that the annual raises are based on the evaluations of the professors, casting doubt on the University's assertions that evaluations have little to do with annual raises. About the University's explanation that market-based starting salaries are the cause of salary differentials, plaintiffs presented evidence that Mikan and Hamilton, to whom MacPherson was compared, were hired at salaries below MacPherson's contemporaneous salary, but have gradually surpassed him in compensation. While Ryerson, to whom Narz was compared, started at a salary approximately the same as Narz's contemporaneous salary, Ryerson now earns significantly more; the rate of salary increase for Rovelstad, who was hired at a higher salary than Narz's contemporaneous salary, was greater than the rate at which Narz's salary increased. Evidence also showed that MacPherson was making less than younger, less senior professors in an academic field in which salary levels were virtually identical to his field and that this differential occurred after Mikan and Hamilton were hired, making it unlikely that the differential occurred because of their M.I.S. training (a factor that would explain an initial salary differential, but not subsequent discrepancies).[20] In addition, plaintiffs presented evidence that the professors to whom MacPherson and Narz were compared had produced little in the way of publications; thus, salary differentials could not be explained by raises based on the publishing of articles. On the University's characterization of Narz as a business law professor, evidence showed that he was hired as an accounting professor and only later began to teach business law courses.

We conclude that there is "evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions." *See Verbraeken*, 881 F.2d at 1045. The evidence presented by plaintiffs is sufficient to allow a jury in the exercise of impartial judgment to conclude that the University's proffered explanations are unworthy of belief. Therefore, we hold that the district court erred in granting j.n.o.v. to the defendant University, and we vacate that judgment.

**2. The Alternative Grant of a New Trial.**

Plaintiffs contend that the district court abused its discretion in its alternative grant of new trial. They say that the district court's belief that the jury was confused by the disparate impact evidence was based on an erroneous view of the law and the record and results in the court's simply substituting its judgment for that of the jury. They also contend that the district court's view that the jury was confused about the law or misled by sympathy rests on speculation.

The district court based its conditional grant of new trial on several reasons. It thought that "the verdict was a result of confusion on the part of the jury (perhaps engendered by the major thrust of the plaintiffs' evidentiary presentation which was devoted to the disparate *impact* claims), if not expressly the result of sympathy or bias." Memorandum of Decision at 2 n. 1 (emphasis in original). The district court also believed that a new trial should be granted so that "evidentiary rulings could be made without there being in the case claims predicated upon disparate impact." *Id.* at 4. In addition, the trial judge was concerned about the testimony of plaintiffs' expert witness, Dr. Ignatin, whose "presentation of evidence on issues of liability was largely devoted to (a) dis-

---

**20.** Evidence also showed that during the first semester that Hamilton taught M.I.S., he was eliminated from teaching it in the future.

parate impact analysis and (b) what he felt was fair and unfair." *Id.*

We review a district court's ruling on a motion for new trial under the abuse of discretion standard because "deference [ ] is due the trial court's first-hand experience of the witnesses, their demeanor, and a context of the trial." *Rosenfield*, 827 F.2d at 1498. Plaintiffs contend that we should look more strictly at this grant of a new trial, implying that the basis for the order is the judge's view that the verdict is against the weight of the evidence. But we believe that the grant of a new trial in this case was based on considerably more than the premise that the verdict was against the weight of the evidence.

While the district court did believe that the verdict was against the weight of the evidence—and granted j.n.o.v.—its grant of a new trial was based on additional concerns about the relevance of evidence (admitted under the disparate impact theory) to the disparate treatment theory; the likelihood that the jury was confused by the plaintiffs' arguments and evidence admitted on the disparate impact theory which was no longer relevant to case; [21] and the court's perception that Dr. Ignatin's testimony, which mainly focused on the disparate impact theory, dealt a great deal with the fairness of the University's treatment of plaintiffs, as opposed to whether the University committed age discrimination against them.[22] Because deference is due the district court's first-hand experience of the evidence, the witnesses, and the jury in the context of trial, we cannot say that the court abused its discretion; and we affirm the grant of a new trial on the disparate treatment theory of age discrimination.

## IV. CONCLUSION

We affirm the district court's action in directing the verdict on the disparate im-

pact theory of discrimination, vacate the grant of j.n.o.v. on the disparate treatment theory of discrimination, and affirm the district court's conditional grant of a new trial on the disparate treatment theory. Therefore, we remand the case for new trial.

AFFIRMED in part; VACATED in part; and REMANDED for new trial.

---

**21.** This confusion is especially important given that the district court itself indicated confusion between disparate impact and disparate treatment and that the court declined to instruct the jury that the court had directed a verdict on the disparate impact theory and that the jury should ignore evidence presented regarding that theory.

**22.** The district court stated, during the course of the trial, its impression that Dr. Ignatin "comes across quite frankly very heavy on what is fair in the labor movement, labor market. We are dealing here with what could be grossly unfair payment and wage scale."