**Dr. Charlie GIBBONS, Plaintiff,**

v.

**AUBURN UNIVERSITY AT MONT-GOMERY (AUM), and Auburn University, Defendants.**

**No. Civ.A. 99–T–1015–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 16, 2000.

Opinion on Reconsideration Aug. 16, 2000.

Alvin T. Prestwood, Calvin L. Williams, Volz, Prestwood & Hanan, PC, Montgomery, AL, for plaintiff.

David R. Boyd, Dorman Walker, J. Beth Moscarelli, Balch & Bingham, Montgomery, AL, for defendants.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Charlie Gibbons, an African American male and former associate professor of Health and Physical Education and director of the Intramural Athletics Program at Auburn University at Montgomery (AUM), filed this lawsuit against his former employers, claiming they subjected him to unlawful racial discrimination. He names both AUM and its parent institution Auburn University as defendants. Gibbons raises two kinds of discrimination claims: he claims that he received a lower salary because of his race and that the defendants retaliated against him in various ways for seeking enforcement of his right against discrimination. He bases his lawsuit on 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, popularly referred to as Title VII of the Civil Rights Act of 1964, and he has properly invoked the jurisdiction of this court pursuant to 28 U.S.C.A. § 1331 (federal ques-

tion), 1343(a)(4) (civil rights), and 42 U.S.C.A. § 2000e–5(f)(3) (Title VII).

On April 14, 2000, the defendants filed a motion for summary judgment, which, after briefing by both parties, the court now addresses. For the reasons that follow, the motion will be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue an to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Where, as here, the non-moving party bears the burden of proof at trial, "the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or present 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir.1991) (en banc)). Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To this end, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

In 1977, Gibbons began working as an instructor in the Department of Health and Physical Education at the AUM School of Education. His starting salary was $ 13,500. He was granted tenure and promoted to the rank of assistant professor in 1989, and promoted to associate professor in 1995. For each of these promotions, Gibbons received a raise in pay. In addition, he received merit and cost-of-living increases in salary in the years when such increases were available to AUM faculty.

Gibbons was also involved in AUM's Intramural Athletics Program, of which he became the director in 1994.[1] In his role as director, Gibbons had many administrative duties, including supervising the AUM weight room facility, scheduling all of the intramural games, hiring students to officiate the games, and administering the payroll for the student employees. In exchange for his additional responsibilities, Gibbons's teaching load was reduced by one third in 1980, and then further reduced to half the normal teaching load in 1994. Gibbons did not receive a salary increase in conjunction with his promotion to director of the Intramural Athletics Program.

At the time of his 1994 promotion to director, Gibbons asked School of Education Dean William Deaton for a raise in salary. When his request was denied, he went to the AUM Chancellor Roy Saigo, who also rejected his request for a raise. He then waited until July 1997 to ask once again for a raise based on his additional responsibilities as director of intramurals. Though he asked for a raise of $ 10,000, he

---

1. The defendants dispute that Gibbons was ever officially appointed as the director of this program. However, because this issue is not crucial to the issues currently before the court, and because the court must consider the facts in the light most favorable to the plaintiff, it will assume that Gibbons did become the director of intramural athletics in 1994.

was ultimately offered only $ 200 per month. Considering this offer too low, Gibbons rejected it and, on October 20, 1997, filed a formal charge with the Equal Employment Opportunity Commission (EEOC) complaining of race discrimination in his salary. At this time, Gibbons's annual salary was $ 40,230.

In February 1998, Auburn initiated the first internal audit of the intramural program payroll in 20 years. The catalyst for this audit was a February 5, 1998, phone call by a former student-employee of the AUM intramural program, who called to inquire about why he had received a 1997 W-2 form from AUM when he had not worked there since 1995. Upon further investigation, AUM officers discovered that this student had remained on the intramural program's payroll, that his paychecks had been signed by someone other than himself, and that these checks had ultimately been deposited into Gibbons's account. Based on this information, AUM ordered an audit.

Around the same time, on February 12, 1998, Gibbons was suspended from his responsibilities with the intramurals program, and he returned to teaching full time. Gibbons filed a second EEOC charge on February 16, 1998, this time claiming that he was suspended from his directorial position in retaliation for filing his initial EEOC complaint.

The report by the internal auditors who examined the intramural payroll records was completed on April 24, 1998. It indicated that Gibbons had embezzled over $ 90,000 from AUM by falsifying student time sheets, signing paychecks over to himself, and depositing them into his own account. In response to this information, Auburn University President William Muse convened a faculty committee to determine whether termination proceedings should be initiated against Gibbons.

The committee of Gibbons's peers reviewed the auditors' report, and, on July 9, 1998, issued a recommendation in favor of termination proceedings for Gibbons.

President Muse accepted this recommendation, and informed Gibbons accordingly. Gibbons then requested a hearing, which was conducted on January 4, 1999, and resulted in a recommendation for termination. Gibbons was informed in March 1999 of President Muse's decision to adopt the committee's recommendation and to terminate him. Gibbons filed an appeal to the Board of Trustees of Auburn, but the appeal was denied. Gibbons received final notification of his termination as a tenured faculty member on September 9, 1999.

Upon his termination, Gibbons requested severance pay equal to one year's salary, the amount recommended by the American Academy of University Professors (AAUP) in cases where the faculty member was dismissed for "reasons not involving moral turpitude." The AAUP recommendations were included in the back of the AUM faculty handbook, and Gibbons therefore assumed that AUM had adopted them and that they applied to his case. On September 26, 1999, AUM informed Gibbons that his request for severance pay was denied.

On October 8, 1999, Gibbons filed his third and final EEOC charge. This time, he claimed that he had been subjected to retaliatory discharge and denial of severance pay in response to his two prior EEOC charges. After receiving notice from the EEOC of his right to sue on the claims asserted in his first two charges, Gibbons filed this lawsuit on September 9, 1999.

On April 14, 2000, the defendants filed a motion for summary judgment, which the court now addresses. For the reasons that follow, the court concludes that the motion should be denied as to Gibbons's traditional wage-discrimination claim and granted as to his raise-based and retaliation claims.

## III. DISCUSSION

Title VII prohibits an employer from discriminating against its employees be-

cause of their race. *See* 42 U.S.C.A. § 2000e–2(a)(1). The employee has the initial burden of establishing by a preponderance of the evidence a prima-facie case of a practice proscribed by Title VII. Many articulations of the prima-facie case exist, but the essence of the prima-facie case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee. If established, the prima-facie case raises a presumption that the employer is liable to the employee under Title VII. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer took unlawful actions against the employee. The employer can meet this burden of production by articulating a legitimate, nondiscriminatory reason for the employment decision, a reason which is clear, reasonably specific, and worthy of credence. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason. *See Burdine,* 450 U.S. at 253–55, 101 S.Ct. at 1093–94. Once the employer satisfies this burden of production, the employer defeats the presumption of intentional discrimination created by the prima-facie case. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The focus shifts to the employee, who retains the ultimate burden of proving by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination. The employee may meet this burden by persuading the fact finder either *directly* that a discriminatory reason more than likely motivated the employer or *indirectly* that the proffered reason for the employment decision is not worthy of belief. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Notwithstanding the shift in the burden of production subsequent to the employee's presentation of a prima-facie case, the employee retains the ultimate burden of persuasion on the question of whether discrimination occurred. *See St. Mary's Honor Center,* 509 U.S. at 511, 113 S.Ct. at 2749.

In this lawsuit, Gibbons advances three claims, each identifying a different action by the defendants that allegedly constitutes discrimination in violation of Title VII. First, he claims that he received a salary lower than that of similarly situated white faculty members. Second, Gibbons argues that the defendants suspended him from his position as director of the intramural program in retaliation for his first EEOC charge regarding the alleged race-based wage disparities. Gibbons's final claim, also complaining of unlawful retaliation, contains two parts: he argues that the defendants terminated him and that it denied him severance pay, both in response to his prior two EEOC claims. The court will first address the wage discrimination claim, and then it will turn its attention to Gibbon's various claims of retaliation.

## A. *Wage Discrimination*

Though Gibbons presents his wage discrimination claim in a rather disjointed fashion, thereby making the precise nature of his complaint rather difficult to discern, it appears that his claim is actually twofold. On the one hand, Gibbons appears to argue that he was wrongfully denied a raise in salary when he was promoted to director of intramurals in 1994, while white faculty members were given raises upon their promotion to directorial positions. At the same time, Gibbons suggests that the real nature of his claim is a more traditional wage-discrimination claim, arguing that he was discriminated against by being paid less than similarly situated

white faculty members over the course of many years. Because it is unclear to the court which of these theories Gibbons intends to advance, it will assume that he means to raise both claims—a "raise-based" claim and a "traditional" claim—and will accordingly address both.

### 1. Timeliness

As a threshold matter, the defendants contend that Gibbons's claims of race-based wage discrimination are time-barred because Gibbons failed to file a charge of discrimination within 180 days of the alleged discriminatory act. In order to bring a Title VII suit in federal court, a plaintiff must first properly file his claim with the EEOC. *See Increase Minority Participation by Affirmative Change Today (IMPACT) v. Firestone,* 893 F.2d 1189, 1196 (11th Cir.1990). Under 42 U.S.C.A. § 2000e–5(e), charges of discrimination must be filed with the EEOC "within 180 days after the alleged unlawful practice occurred." Failure to timely file with the EEOC is ordinarily a bar to suit. *See Alexander v. Gardner–Denver,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974).

Normally, the 180–day limitations period begins running "from the date the employee knows or reasonably should know that he or she has been discriminated against." *Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1545 (11th Cir.1988). However, there is an important exception that courts have carved out for so-called "continuing violations" or, perhaps more aptly called, "recurring violations." A continuing violation occurs when the discrimination complained of is not a one-time event, but rather "the violation exists every single day the employee works." *Calloway v. Partners National Health Plans,* 986 F.2d 446, 449 (11th Cir. 1993). Therefore, the 180–day limitations period does not start running once and for all as soon as the plaintiff begins to suffer discrimination, or even when he first becomes cognizant of it. Instead, the limitations clock on a continuing or recurring violation is reset at zero with each new day that the violation is perpetrated against the plaintiff. In such instances, so long as the plaintiff files suit within 180 days after the last instance of discrimination, the suit is considered timely.

In order to determine whether an alleged instance of discrimination is a continuing or recurring violation, the Eleventh Circuit has stated that the court should look to the period of time immediately preceding the filing of the EEOC charge. If the initial discriminatory act falls outside the 180 days before the charge was filed, but the court can still identify discrete discriminatory acts occurring within that period—for example, "Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII," *Bazemore v. Friday,* 478 U.S. 385, 395, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986)—then the violation is considered continuing or recurring, and the case timely filed. *See Knight v. Columbus, Georgia,* 19 F.3d 579, 582 (11th Cir.1994). If no violation occurred at any time within the statute-of-limitations window, however, there is no continuing or recurring violation, and the case is time-barred. Moreover, a "discriminatory act [that] continues to adversely affect the employee or that the employer presently refuses to rectify ... will not satisfy the [statute of limitations]." *Knight,* 19 F.3d at 580.

The important question in the continuing or recurring violation analysis is whether the plaintiff complained of " 'the present consequence of a one time violation which does not extend the limitations, [or] the continuation of that violation into the present, which does,' " *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 448 (11th Cir.1993) (quoting *Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir.1992)). Where a continuing or recurring violation is found, the plaintiff may recover for any violation for which the statute of limitations has not expired. *See Knight,* 19 F.3d at 581.

Distinguishing between the present consequences of a one-time violation and the continuance or recurrence of a violation can be elusive, to say the least, *see Beasley v. Alabama State University,* 966 F.Supp. 1117, 1129 (M.D.Ala.1997), and attempting to make this distinction within the context of wage discrimination can be down right ethereal. But the Eleventh Circuit Court of Appeals has said that the latter can, and must be done, and this court must therefore make the attempt.

In *Knight v. Columbus, Ga.,* the appellate court held that one group of employees, who should have been, but were not, paid for overtime hours, suffered continuing or recurring violations and thus could recover although the initial decision not to comply with the Fair Labor Standards Act (FLSA), 29 U.S.C.A. §§ 201–219, was made outside the limitations period; but that another group of employees who alleged that they did not receive a deserved FLSA raise could not recover because the failure resulted from only one act outside the limitations period. *See* 19 F.3d at 581–584. In the first instance, the initial decision not to pay was viewed as recurring; whereas in the second the initial decision not to pay was seen as a one-time event.

The Eleventh Circuit seems to suggest that one critical factor in making this distinction is whether the elements necessary to prove the claim can be found based on evidence within the limitations period. *See id.* at 583. ("It is true that the City's original adoption of the pay policy occurred more that three years ago, but the officer plaintiffs need not prove the adoption of that pay policy to recover. If they are truly not exempt employees, the officer plaintiffs only need to prove that they have worked unpaid overtime hours during the statute of limitations period."). Applying this test, this court must conclude that Gibbons can recover for his traditional claim but not for his raise-based claim.[2]

■ As stated, generally when an employee receives a lower salary than that received by comparable co-workers of a different race, his rights are violated anew each time he receives such a reduced paycheck. *See Bazemore,* 478 U.S. at 395 & n. 6, 106 S.Ct. at 3006 & n. 6; *see also Knight,* 19 F.3d at 582; *Calloway,* 986 F.2d at 449; *see also Malone v. K–Mart Corp.,* 51 F.Supp.2d 1287, 1309 (M.D.Ala. 1999) (DeMent, J.). Therefore, so long as the employee files his EEOC charge within 180 days after the last discriminatory paycheck, the court can discern an instance of discrimination within the limitations period. By filing his EEOC charge in October 1997, while the alleged wage disparity between Gibbons and his white colleagues' salaries was ongoing, he was well within the permissible filing period. The court therefore concludes that Gibbons's traditional wage-discrimination claim is not time-barred.

■ The same is not true, however, for Gibbons's claim that the defendants failed to give him a raise upon his promotion to director of intramurals. This claim is more akin to the second scenario presented in *Knight,* where the plaintiffs alleged that they were denied a raise owed to them under the FLSA, *see* 19 F.3d at 584, and the court found that there was no continuing or recurring violation. This claim would not make sense without focusing on the initial decision made in 1994,

2. The above test—of whether the claim can be established based on evidence within the limitations period—becomes elusive as well when one takes into consideration that evidence outside the limitations period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). And with regard to the contention that "[e]ach week's pay check that delivers less to a black than to a similar situated white" constitutes a recurring violation, there is a serious question as to whether this test really upholds when, in determining whether the difference in treatment is a pretext for race, the focus of the litigation is on an initial decision made outside the limitations period.

either on the day that Gibbons alleges that he was promoted to intramurals director and failed to receive a raise, or, at the latest, when he first demonstrated his knowledge of the discrimination by asking for a pay raise, both of which occurred outside the limitations period. The 180-day limitations period on Gibbons's raise-denial claim therefore began to run in 1994. Because he waited until October 20, 1997, to file his first EEOC claim, Gibbons far exceeded the period within which Title VII required him to take administrative action as to this claim.

### 2. Prima-Facie Case

■ In order to establish a prima-facie case of racial discrimination based on differences in salary, "the plaintiff must show that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1074 (5th Cir.1981). Viewing the facts in the light most favorable to Gibbons, as the court must at this stage in the litigation, the court concludes that Gibbons has satisfied this burden.

Gibbons and the defendants have produced a variety of figures representing different AUM faculty members' salaries at different times during the course of Gibbons's employment with the university. Of all of these, the white individual most similarly situated to Gibbons is Dr. Richard Hebert. Unlike the others, Hebert was hired by AUM at roughly the same time as Gibbons, achieved the same rank, and served as a program director in addition to his teaching responsibilities. All of the other white comparators presented by the parties either were hired much later than Gibbons, achieved a higher rank, or lacked the combination of teaching and administrative responsibilities that Gibbons and Hebert both shouldered.

The defendants argue that even Hebert is not similarly situated enough to Gibbons to represent a valid comparator for the purpose of establishing a prima-facie case under Title VII. They point out, for example, that Hebert worked in a different school within AUM, and that the program he administered was academic rather than recreational. The defendants are correct to assert that a plaintiff seeking to demonstrate that similarly situated white employees were treated differently must produce evidence that his comparators were "similarly situated in all relevant respects." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citing *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994), *cert. denied* 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995)). However, the defendants have failed to explain why a difference in the schools where the faculty members worked, or in the academic merit of the programs that they administered, is "relevant" to an evaluation of their relative salaries. And though the court recognizes that Gibbons and Hebert are perhaps not a perfect match, it also takes heed of the following statement: "It would indeed be a rare case in which a black employee ... is able to present a precise comparison, or an equation, between her job responsibilities and those of a higher paid non-protected employee. The workplace is very rarely that simple an environment. It is susceptible to discrimination of a very subtle nature." *Walton v. Cowin Equipment Co., Inc.,* 774 F.Supp. 1343, 1345 (N.D.Ala.1991). If the court required Gibbons to produce evidence of a white individual whose position within the university mirrored his own in every respect, Gibbons would most likely find that no such individual existed. Thus, the court concludes that Gibbons and Hebert were positioned similarly enough—in terms of seniority, rank, and job responsibilities—to make a comparison of their salaries meaningful for the purpose of evaluating Gibbons's wage discrimination claim.

■ When Hebert was hired as an instructor in 1977, his salary was $ 18,360, which was $ 4,860 more than the starting

salary Gibbons received one year earlier. By the time Gibbons filed his first EEOC charge in 1997, Hebert had become an associate professor and the director of AUM's Med Tech program, and his salary was $ 54,290, or $ 12,060 more than what Gibbons was earning at that time. The court concludes that this evidence is sufficient to establish a prima-facie case of wage discrimination.[3]

### 3. Legitimate Non–Discriminatory Reason

■ The Eleventh Circuit Court of Appeals has held that the establishment of a prima-facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. System*, 701 F.2d 1383, 1389 (11th Cir.1983), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983). Rather, the court should consider whether the defendant has provided sufficient evidence to rebut presumption of discrimination by offering a legitimate non-discriminatory reason for having paid the plaintiff a lower salary than similarly situated white employees. Although "[i]n general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent," *Thornbrough v. Columbus and Greenville R.R.*, 760 F.2d 633, 640 (5th Cir.1985), "the inference of intentional discrimination raised by a plaintiff's prima-facie case may be stronger or weaker, depending on the facts of the particular case." *Grigsby*, 821 F.2d at 595. "In some cases, the defendant's evidence of a legitimate, non-discriminatory reason for its actions may be

so strong as to rebut completely the inference raised by the plaintiff's prima facie case." *Id.* at 596. In other words, a "plaintiff may not in all cases merely rest on the laurels of [his] prima facie case in the face of powerful justification evidence offered by the defendant." *Id.* at 596; *see also Brown v. American Honda Motor Co.*, 939 F.2d 946, 950 (11th Cir.1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).

In the case currently before the court, however, the defendants have failed to produce sufficient evidence to overcome Gibbons's prima-facie case and warrant summary judgment. The defendants contend that, rather than having a formulaic system of setting starting salaries, they base each new faculty member's salary on a variety of factors, and rely in particular on market forces. Without making any findings regarding the credibility of this explanation, the court concludes that it is not so strong as to preclude a reasonable inference that race was the primary motivator for the differences in salary along racial lines.

This circuit has stated that the use of a market-force theory to rebut a prima-facie case of race-based wage discrimination is inherently suspect: "Without needing to condemn unwritten, informal, vague, and subjective salary determination procedures as highly susceptible to the abuses of racial discrimination, it is enough to note that, if the difference in labor value of a white [employee] and a black [employee] stems from the market place putting a different value on race, Title VII is violated." *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. May 13, 1981) (internal citations omitted).[4] In other words, the mere fact that

---

**3.** The defendants encourage the court to compare not the actual salaries of Gibbons and his comparators, but rather the percentage change in their salaries over the course of their employment. The defendants provide no case law supporting such an approach, however, nor has the court's research uncovered any. Indeed, the method advocated by the defendants would give rise to the inference that employers may, within the bounds

of Title VII, pay white employees higher salaries, so long as they raise their lower-paid black employees' salaries at the same or at a higher rate. This interpretation of Title VII is incorrect, and the court rejects it.

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth

market forces allowed Hebert to demand a higher salary than Gibbons does not erase an inference that the underlying reason for that advantage was race.

Therefore, rather than relying on vague allegations that "market forces" lead to differences in salary, the defendants must support their argument with more specific information about the non-discriminatory elements that drive the relevant market. In *MacPherson v. University of Montevallo*, 922 F.2d 766 (11th Cir.1991), for example, in which the Eleventh Circuit accepted the defendant's market-force explanation for age-based salary differentials, the defendant university provided detailed evidence about how placement in each of the school's departments influenced a faculty member's starting salary. *See id.* In this case, by contrast, the defendants support their non-discriminatory explanation of the wage differentials between Gibbons and his white colleagues only with the affidavit by a high-ranking administrator who asserts that "[s]tarting salaries for AUM faculty members are based on the supply and demand for a particular discipline at the time of hiring, and on each individual's qualifications." The defendants provide no further explanation about which departments' faculty members typically receive higher or lower salaries, and whether this pattern explains the difference between Hebert's and Gibbons's salaries. Although the defendants' explanation that market-force theory might persuade jurors that race was not the primary motivation for the disparities in salary along racial lines, especially if supported with more detailed evidence, it is therefore not so strong as to overcome Gibbons's prima-facie case and warrant summary judgment.

### B. *Retaliation*

█ Title VII also protects employees from retaliation for certain protected activities. Title VII provides, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because

he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e–3(a). A prima-facie case of retaliation under Title VII requires a showing of (1) participation in actions protected by the statute; (2) an adverse employment action; and (3) a causal link between the protected actions and the adverse employment decision. *See Hamm v. Members of the Bd. of Regents*, 708 F.2d 647, 654 (11th Cir.1983). The Eleventh Circuit has explained its interpretation of the "causal link" prong of a retaliation claim not as "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action," since that could require direct evidence of discrimination. *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985). Instead, "the 'causal link' element ... require[s] merely that the plaintiff establish that the protected activity and the adverse action are not wholly unrelated." *Simmons*, 757 F.2d at 1189; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir.1991); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir.1990).

█ Though he has framed his lawsuit as asserting two claims for unlawful retaliation, Gibbons's case is better divided into three distinct retaliation claims. First, Gibbons claims that the defendants retaliated against him for filing his first EEOC charge by suspending him from his position as the director of the intramurals program. Second, Gibbons asserts that the defendants retaliated against his second and third EEOC charges by terminating him from his position as a tenured faculty member. Finally, Gibbons claims that the defendants denied his request for

Circuit handed down prior to the close of    business on September 30, 1981.

severance pay in retaliation against his second and third EEOC charges.

In the typical case, the court begins its analysis by determining whether the plaintiff has produced evidence that could lead a reasonable fact finder to conclude that he has established each element of a prima-facie case. This, however, is not the typical case. Here, the evidence produced by the defendants as to the second stage of Title VII analysis—the existence of a legitimate non-discriminatory reason for the adverse employment action—is so overwhelming that it would defeat the presumption of liability created by even the most airtight prima-facie case. Rather than belaboring over each element necessary to satisfy Gibbons's initial burden, therefore, the court will proceed directly to stage two in the *McDonnell Douglas* framework and take up the defendants' rebuttal evidence.

In short, the defendants argue that they suspended Gibbons from the directorial position, terminated him, and denied him any terminal pay because Gibbons forged student paychecks and thereby embezzled a large sums of money from the university. Just before Gibbons was notified of his suspension, the defendants received information and conducted a preliminary investigation leading it to believe that Gibbons had fraudulently secured intramural-program funds for his own benefit in the name of a student who no longer worked at AUM. This information led AUM to initiate a formal audit of the intramural program payroll, which in turn uncovered evidence indicating that Gibbons had embezzled over $ 90,000 from the program. Given these facts, a reasonable juror could infer only one thing: that the defendants' decisions first to suspend Gibbons from his directorial job, and then to terminate him altogether, were motivated primarily by Gibbons's unlawful and unethical behavior, rather than by race. Furthermore, the

decision not to provide Gibbons any severance pay is also explicable through the university's discovery that he had embezzled huge sums of money from the intramural program. The severance pay policy cited by Gibbons clearly indicates that no such pay is due when the faculty member is dismissed for "reasons involving moral turpitude." Given this clause in the policy, no reasonable inference can be drawn that retaliatory motives underlay the decision not to award Gibbons an additional year's salary upon his departure. Because the defendants' rebuttal evidence as to all three of Gibbons's retaliation claims merits only one conclusion, the court concludes that the motion for summary judgment is due to be granted as to all three.

## IV.  CONCLUSION

For the foregoing reasons, it is ORDERED that the motion for summary judgment, filed by defendants Auburn University at Montgomery and Auburn University on April 14, 2000, is granted in part and denied in part as follows:

(1) Summary judgment is denied as to plaintiff Charlie Gibbons's claim that he was unlawfully paid a lower salary than similarly-situated white faculty members.

(2) Summary judgment is granted in said defendants' favor as to plaintiff Gibbons's claim that he was denied a salary raise at the time of his promotion to director of intramural athletics, and as to all of plaintiff Gibbons's claims of unlawful retaliation.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

## MEMORANDUM OPINION

■  Currently before the court are the defendants' motions for reconsideration of this court's August 9, 2000, order granting in part and denying in part summary judgment to the defendants.[1]  The defendants

---

1. As an alternative, the defendants also ask for a continuance and leave to file supplemen-    tal summary judgment.

contend that plaintiff Gibbons never properly asserted a "traditional" wage-discrimination claim of race-based disparities in salary throughout his employment at AUM, and that the court therefore erred in denying summary judgment as to the claim. For the reasons that follow, the court concludes that, regardless as to whether the traditional claim was originally asserted, Gibbons did not preserve the claim in the pretrial order. The court will therefore grant the motions for reconsideration.

In his original complaint, filed on September 9, 1999, Gibbons framed his wage-discrimination claim in the vaguest possible terms, making it impossible for the defendants end the court to identify the precise nature of his claim. After reviewing the parties' briefs on summary judgment, the court concluded that the parties seemed to address two distinct wage-discrimination claims: a "traditional" claim that Gibbons was paid less than similarly situated white faculty members throughout the term of his employment at AUM and a "raise-based" claim that Gibbons was unlawfully denied a raise upon his alleged promotion to director of intramurals. For reasons explained in its August 9 order, the court denied summary judgment as to the former and granted summary judgment as to the latter. The defendants now challenge the denial of summary judgment as to the traditional claim, arguing that the claim was either never asserted or, at the very least, not preserved for trial in the pretrial order. The court agrees.

Rule 16(e) of the Federal Rules of Civil Procedure provides: "After any [pretrial] conference held pursuant to this rule, an order shall be entered rectifying the action. This order shall control the subse-

quent course of the action unless modified by a subsequent order." Thus, courts have uniformly held that the pretrial order must set forth all of the factual and legal issues to be presented at trial, and that an issue should be considered as waived by the parties if not included in the pretrial order. *See, e.g., Morro v. City of Birmingham,* 117 F.3d 508, 516 n. 3 (11th Cir.1997) ("Counsel may waive the right to have an issue decided by failing to identify the issue to the court at the pretrial conference, regardless of whether the issue is a legal or factual one."), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1299, 140 L.Ed.2d 465 (1998); *see also* 3 Moore's Federal Practice, § 16.78[3] (Matthew Bender 3d ed.). Based on this well-established law, Gibbons's counsel agreed during a telephone conference conducted on August 25, 2000, that, if his traditional salary-discrimination claim was not included in the pretrial order, it should be considered waived.

The court finds that the pretrial order did not preserve Gibbons's claim that he received a salary lower than that of similarly situated white faculty throughout the term of his employment at AUM. The pretrial order lists as Gibbons's contention only that "he was denied a salary increase as director of Intramural Sports similar to that of similarly-situated white faculty members in 1997 based upon his race, and that he was retaliated against for the exercise of his right to free speech when he filed charges of discrimination with the Equal Opportunity Employment Commission (EEOC)." Nowhere in this statement does Gibbons suggest that he intended to assert a traditional race-based wage-discrimination claim at trial.[2] The court therefore considers the claim, if ever asserted originally, to have been waived.

---

**2.** This interpretation of the pretrial order is fortified by Gibbons's own deposition testimony about the nature of his wage-discrimination claim. When asked by defense counsel whether he thought race had anything to do with the setting of his salary before 1995, Gibbons responded: "Not—not before I was named director." Quite clearly, then, Gib-

bons did not intend to assert a traditional claim that his salary was lower than that of similarly-situated white employees throughout his employment at AUM. Instead, his only wage-discrimination claim related to the denial of a raise at the time he was allegedly promoted to director of intramural athletics.

Accordingly, an appropriate judgment will be entered granting the defendants' motions for reconsideration and entering summary judgment in favor of defendants on all claims in light of the fact that there is no raise-based claim in this case.